IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 22, 2003 Session

# IN THE MATTER OF S.Y., J.Y., AND D.Y.

**A Direct Appeal from the Juvenile Court for Shelby County**
**No. K5593     The Honorable George E. Blancett, Special Judge**

_____

**No. W2002-00593-COA-R3-JV - Filed February 18, 2003**

_____

Department of Children's Services filed petition to terminate parental rights of mother of dependent and neglected minor children. Department's termination petition was based on allegations of abandonment, mother's failure to substantially comply with a permanency plan, and the removal of the children for at least six months with little likelihood that the condition causing removal will be remedied. Juvenile Court granted petition terminating mother's parental rights. Mother appeals, asserting that juvenile court violated her due process rights by failing to appoint an attorney for the dependent and neglect proceeding, and erred in concluding that clear and convincing evidence exists to support findings that warrant termination of parental rights. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY KIRBY LILLARD, J., joined.

William T. Winchester, Memphis; Webb A. Brewer, Memphis, For Appellant, Gloria Jean Young

Paul G. Summers, Attorney General and Reporter, Dianne Stamey Dycus, Deputy Attorney General, For Appellee, Tennessee Department of Children's Services

## OPINION

On April 6, 1999, siblings S.Y., J.Y., and D.Y. ("minor children"), were removed to the custody of the Juvenile Court of Shelby County, Tennessee, on suspicion that the children were dependent and neglected. The Tennessee Department of Children's Services ("DCS") filed a petition in the juvenile court on April 8, 1999, requesting the "protection and assistance of the Court," and further calling for an "adjudication of custody and guardianship as provided by law." DCS's petition set forth the following allegations:

> Said children are dependent and neglected children within the
> meaning of the law of the State of Tennessee in that said children are
> under such improper guardianship or control as to injure or endanger
> their health or morals. That the children were transported to Juvenile

Court on April 6, 1999, and the mother [Gloria Jean Young ("Young")][1] was transported to the Regional Medical Center for evaluation. That the children were observed to be dirty and reported that they had not eaten in two days. The family reportedly has no permanent address and the mother appears to be unable to provide a stable, safe home for the children and may be in need of mental health treatment. That an older sibling was previously removed from the mother's care for neglect.

The circumstances create a threat of severe harm to said children and there is no less drastic alternative to removal that would protect said children from harm. Further, reasonable efforts to prevent removal have been made and placement of said children in foster care is in said children's best interest.

That same day, the court entered a Protective Custody Order bringing minor children within the protective custody of the juvenile court and awarding temporary custody to DCS. As part of this Order, the court appointed Community Services Agency (CSA) to conduct an investigation into minor children's needs, and instructed CSA to file a written report advising the court of its findings.

Following the removal of minor children from appellant Young's care, DCS established a permanency plan that required Young to obtain stable housing, participate and schedule consistent visitation with the children, and undergo a psychological evaluation. The underlying goal of this plan was family reunification. As revealed by the sworn testimony of Darnese Windham ("Wyndham"), a case manager for DCS who was assigned to this case on June 1, 2001, at least three updated versions of the original plan have been drafted since April 1999. Young contends that she has never signed a permanency plan, and further maintains that DCS has never discussed any of the plans, either the original or the updated versions, with appellant. When questioned on direct examination at a hearing before the juvenile court on January 27, 2002, Wyndham acknowledged that Young did not sign the original plan or the updated plans, and did not participate in, or have explained, any of the updated plans, but asserted on cross examination that, although no documentation exists to verify that any of the plans were explained to appellant, the notes from a former case manager on this file led Wyndham to believe that Young was involved in the first permanency plan. None of the plans, original or updated, were entered as exhibits to the Technical Record in this case.

A hearing was held on May 25, 1999 regarding DCS's dependency and neglect petition. After examining witnesses and considering the presented evidence, the presiding Referee of the juvenile court sustained the petition and recommended that it was in the best interests of the children

---

[1] In its petition, DCS stated that appellant Young's residence was unknown. Additionally, the petition provides that the identity of the minor children's natural father was also unknown. Frank Wilson ("Wilson") has been named as the putative father.

to be placed in the custody of DCS. It is undisputed that Young was not represented by an attorney at this dependent and neglect hearing, and it is further acknowledged that the court took no action to appoint an attorney on appellant's behalf.

On October 5, 1999, Honorable Claudia S. Haltom, presiding Referee, recommended that the children "remain in foster care with the goal changed to Adoption and CASA is hereby appointed in light of the goal change." The case was continued several times, with each continuance entered upon the recommendation of a Referee that it was in the best interests of the children to remain in foster care.

CASA representative Felecia C. Wade, filed a Diligent Search Affidavit on March 8, 2001, stating that she was unable to determine the whereabouts of appellant Young despite a search of the "[t]elephone directory in Memphis, Department of Safety, Jail Management System, Credit Bureau, Clearing House, Electronic parent locator, and Letters to the last known address of said parent(s)."

On March 12, 2001, CASA and DCS filed a joint Petition for Termination of Parental Rights, seeking to terminate the parental rights of Young, Wilson, and any unknown father of the minor children. In support of their petition to terminate, CASA and DCS asserted that Young unlawfully abandoned minor children, pursuant to T.C.A. § 36-1-113(g)(1), by willfully failing to visit and pay support to the children for a period of four consecutive months "immediately preceding the filing of this petition." Additionally, petitioners argued that, pursuant to T.C.A. §§ 36-1-113(g)(2) and 37-2-403, Young "substantially failed to comply with the statement of responsibilities contained in the Permanency Plans of the minor children," and noted that, despite the reasonable efforts of DCS to assist in the establishment of a suitable home as required by the guidelines of the permanency plans, appellant "made no reasonable effort to provide a suitable home and demonstrated a lack of concern for the children to such a degree that it appears unlikely that she will be able to provide a suitable home for the children at an early date." Asserting that the termination of Young's parental rights is in the best interests of minor children, petitioners also noted that the children, pursuant to T.C.A. § 36-1-113(g)(3)(A), had been removed from appellant's custody for a period of at least six months, and cited the following reasons to justify permanent removal:

> A. The conditions which led to the children's removal or the conditions which in all probability would cause the children to be subjected to further abuse or neglect and which, therefore, prevent the children's return to the care of Respondent, Gloria Young, still persist;

> B. There is little likelihood that these conditions will be remedied at an early date so that the children can be returned to Respondent, Gloria Young, in the near future; and

C. The continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a stable and permanent home.

On June 8, 2001, the juvenile court entered an Order appointing attorney Danese Banks to represent Young in the termination of parental rights proceeding. That same day, the court entered an Order appointing attorney Andrew Bernstein as guardian ad litem for the minor children for purposes of the termination proceeding.

In August 2001, DCS filed the first of two sworn affidavits from Windham.[2] In each of the affidavits, Windham testified that removal of minor children from Young's care was necessary, and verified that DCS, despite reasonable efforts, was unable to provide services to appellant because her whereabouts were unknown.

Attorney Bernstein filed a Confidential Answer setting forth his findings and recommendations on the case. Based on his home visit and interviews with Young, the children's maternal grandmother, and the current foster parents, discussions with Windham and a second DCS case manager, and review of all pertinent legal, social, and criminal files and records, Bernstein entered the following recommendations:

(1) Children are very bonded and dependent upon each other and, when considering any placement, it would be detrimental to separate them.

(2) If the Foster Parents indicate that they are willing to adopt all three Children, then it is in the best interest of Children to terminate the rights of the natural parents.

(3) If Foster Parents are unwilling to adopt and Mr. Wilson is found not to be the natural father of one or more of Children, then it is in the best interest of Children that Mother's and all known and unknown fathers' parental rights be terminated, and that Children be made available for adoption.

(4) If Foster Parents are unwilling to adopt and Mr. Wilson is found to be the natural father of all three children, then Guardian believes that it is in the best interest of Children to not terminate parental rights at this time, but rather allow time for Father to increasing [sic] levels of visitation to determine whether he can provide a permanent home for Children.

---

[2] Windham's second affidavit is dated December 31, 2001.

As part of his Confidential Answer, Bernstein included the following factual findings regarding Young:

> Mother, 40, who is pregnant with her eighth child, lives in a small home[3] in Olive Springs, Mississippi with two of her seven children who range in age from 2 to 16 years. Mother reports that all of the children (two live with maternal grandmother, three are in foster care) are healthy, have never been in trouble with the law, and are in school. She has never married or been arrested, and reports that she does not drink or use drugs.
>
> Although Mother graduated from high school, it was Guardian's impression that she is intellectually slow and has some difficulty in following conversations and directions, in caring for the children, and in coping with everyday problems. She reports that her monthly income consists of $170 from TAM, a state-sponsored work program, about $400 working as a maid, child support from Mr. Wilson for one child, and $340 in food stamps.
>
> Mother blames her lack of visitation on her required attendance at TAM training sessions, her lack of transportation, and because the Children are in school and unavailable for visitation. She adamantly denies that Children were ever without food or that she ever abused any of them. Aside from her 70 year old mother, who is already raising two of her children, Mother has no family support available to help her with the children. She admits that Children did not attend school while in her care although they [were] then 6 ½, 5 ½, and 5 years old.
>
> Guardian believes that Mother would be unable to cope with the addition of three more children in her home now or at any time in the foreseeable future, although she would never purposefully harm Children, that any continuing relationship between her and Children would confuse Children and detrimentally affect their adjustment to life in the home where they now live or will live in the future.

The record also includes an undated, Supplemental Confidential Answer from Bernstein. Based on further investigation, Bernstein provided the following findings of fact:

---

[3] Young testified that she currently lives with three of her children in a two bedroom, one bathroom home in Holly Springs, Mississippi.

Foster parents, Carter Eugene Scales and Greta Faye Hardin Scales, have informed Guardian that they want to adopt Children as soon as possible.

Mother, Gloria Young does not have a job nor has she contacted Children at least since previous Court date on November 15, 2002.

For these reasons, Bernstein recommended that "[i]t is in the best interest of Children to terminate the rights of the natural parents."

A hearing on the Petition to Terminate Parental Rights was held on February 7, 2002. In an Order entered later that same day, the court terminated Young's parental rights, entered a default judgment against Wilson, and placed minor children in the "complete custody, control and guardianship of the Department of Children's Services, which shall have the right to place said children for adoption and to consent to such adoption *in loco parentis*." The court offered the following conclusions of law as a basis for its ruling:

> That this Court finds clear and convincing evidence to support the termination of parental rights in that pursuant to T.C.A. § 36-1-113(g)(3)(A), said children have been in the custody of the State of Tennessee, Department of Children's Services, for more than six months next preceding the filing of this petition, and the conditions which led to removal, *or other conditions which, in all reasonable probability would cause said child to be subjected to further abuse or neglect* and which, therefore, prevent said child's return to the care of Mother still persist. Further, that there is little likelihood that these conditions will be remedied at an early date so that said children can be returned to said parent(s) in the near future. Further, that the continuation of the legal parent and child relationship greatly diminishes said children's chances of early integration into a stable and permanent home and that continuation of the legal parent/child relationship is not in said child's best interests.
>
> That this Court finds clear and convincing evidence that Respondent, Gloria Young, has substantially failed to comply with the statement of responsibilities contained in the permanency plan pursuant to T.C.A. § 36-1-113(g)(2) and § 36-2-403.
>
> That this Court finds clear and convincing evidence to support the termination of parental rights in that pursuant to T.C.A. § 36-1-102(1)(A)(I) and (iv), the Respondent Gloria Young has willfully abandoned said children in that she has not visited said children nor

made any contribution toward the support of said children for four months immediately preceding the filing of the petition.[4]

(emphasis added).

Young appeals, presenting the following issues for review: (1) Whether the juvenile court's failure to appoint an attorney to represent Young at the dependent and neglect proceeding violated appellant's due process rights under the federal and state constitutions; (2) Whether the juvenile court erred in terminating Young's parental rights for substantial noncompliance with the permanency plan when no such plan(s) was explained or presented to, or signed by, appellant, and DCS failed to maintain communication with Young to facilitate visitation with minor children; (3) Whether the evidence "preponderates against the Juvenile Court's finding that the conditions which led to children's removal still exist."

DCS presents the additional issue of whether termination of parental rights is in the best interests of the children.

Pursuant to T.C.A. § 36-1-113(c)(1)(2) (2001), termination of parental rights must be based on a finding by clear and convincing evidence that grounds for termination exist, and that such termination is in the best interest of the child. Since this case was tried by the trial court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d).

**I.**

The first issue presented by Young for review is whether the juvenile court's failure to appoint an attorney to represent appellant at the dependent and neglect proceeding violated her due process rights under the federal and state constitutions.

In the case of *In re Hoover-Crawford,* No. M2000-10655-COA-R3-CV, 2001 WL 846044, at *4 (Tenn. Ct. App. July 27, 2001), this court considered the precise issue of whether an appellant's "due process rights are violated by the trial court's failure to appoint counsel for the initial dependency and neglect proceeding...." Explaining the Eastern Section's decision in *State v. Wilkerson*, No. 03A01-9810-JV-00341, 1999 WL 775759, at *1 (Tenn. Ct. App. Sept. 15, 1999), the court noted that a "trial court's decision should not be reversed for any deprivation of due process

---

[4] During her sworn cross examination testimony at a January 27, 2002 hearing before the juvenile court, Young admitted that DCS arranged transportation for her two visits with the children in 1999. Young further testified that she last called DCS in August 2001 to inform the department that she would not be able to come to court for a hearing because she was having a baby.

that occurred at an initial dependency and neglect proceeding when [appellant] was afforded full procedural protection[5] at the termination proceeding." *Hoover-Crawford*, 2001 WL 846044 at *4-5.

As in *Hoover-Crawford,* the appellant in this case does not "dispute that she was afforded full procedural protection at the termination proceeding upon which the appeal is based. Rather, [appellant] argues a lack of due process ... at the dependency and neglect hearing...." *See id*. at *5. The facts in this case indicate that Young had adequate notice of the hearing pursuant to the juvenile court's Order of Publication, that she was present at the termination proceeding, that she testified on her own behalf with the benefit and presence of counsel at a January 27, 2002 hearing before the juvenile court, and at all times during the termination proceeding received full assistance of counsel.

In accordance with *Hoover-Crawford* and *Wilkerson*, we hold that any violation of appellant's due process rights, and any violation of the Tennessee Rules of Juvenile Procedure that may have occurred at the dependent and neglect proceeding, was fully remedied by the procedural protections provided Young at the termination hearing.

## II.

The remaining issues can be condensed into the single inquiry of whether clear and convincing evidence exists to support the juvenile court's decision to terminate Young's parental rights, and whether such termination was in the best interests of the minor children.

It is a well established premise that "[a] parent has a fundamental right to the care, custody and control of his or her child." *Dept. of Children's Servs. v. Wiley*, No. 03A01-9903-JV00091, 1999 WL 1068726, at *3 (Tenn. Ct. App. Nov.24, 1999) (citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). A parent's right to the care, custody, and control of his or her child is not absolute and may be terminated if justified by clear and convincing evidence under the applicable statute. *See In re C.W.W., N.W.W., Z.W.W., & A.L.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000) (citing *Wiley*, 1999 WL 1068726, at *3 (citing *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982))). Termination of parental rights must be based on a finding, by clear and convincing evidence, that the grounds for termination of rights have been established and the termination of parental rights is in the best interest of the child. T.C.A. § 36-1-113(c)(1) and (2). In addition, in order to terminate parental rights there must be a showing that

---

[5] We interpret full procedural protection to include notice of the termination proceeding, notice and understanding of appellant's right to an attorney, and the appointment of an attorney where an appellant cannot afford to hire one on their own behalf.

the parent is unfit or that substantial harm to the child will result if the parental rights are not terminated. *In Re Swanson*, 2 S.W.3d 180, 188 (Tenn.1999) (citations omitted).

T.C.A. § 36-1-113(g) (2001) sets forth the following grounds for the termination of parental or guardianship rights:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:
>
> (1) *Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred*;
>
> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;
>
> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (I) The conditions which led to the child's removal *or other conditions* which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

(emphasis added).

Abandonment is defined under T.C.A. § 36-1-102 (Supp. 2002) as:

> (1)(A) "Abandonment" means, for purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, that:
>
> (I) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights

of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child;

(ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date;

*****************************************************

(D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means that, for a period of (4) consecutive months, no monetary support was paid or that the amount of support paid is token support;

(E) For purposes of this subdivision (1), "willfully failed to visit" means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitations;

(F) Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child;

(G) "Abandonment" and "abandonment of an infant" do not have any other definition except that which is set forth in this section, it being the intent of the general assembly to establish the only grounds for abandonment by statutory definition. Specifically, it shall not be

required that a parent be shown to have evinced a settled purposed to forego all parental rights and responsibilities in order for a determination of abandonment to be made. Decisions of any court to the contrary are hereby legislatively overruled.

The existence of any of these statutory bases will support termination of an individual's parental rights. *See In re C.W.W., N.W.W., Z.W.W., & A.L.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000).

The Tennessee Supreme Court has determined that, in construing T.C.A. § 36-1-102(1)(D) governing the termination of parental rights for willful failure to support, an element of intent cannot be read into the definitions of "willfully failed to support" and "willfully failed to make reasonable payments toward such child's support." *In re Swanson*, 2 S.W.3d 180, 187 (Tenn. 1999). The Court has further defined the standard for concluding whether abandonment has occurred in a case governed by the adoption statutes:

> Abandonment imports any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. It does not follow that the purpose may not be repented of, and, in proper cases all parental rights again acquired.... But when abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated, or can be, consistently with the welfare of the child.[6]

*In re Adoption of Bowling*, 631 S.W.2d 386, 389 (Tenn. 1982) (quoting *Ex parte Wolfenden*, 49 Tenn. App. 1, 5, 349 S.W.2d 713, 714 (1959) (quoting 1 Am. Jur. *Adoption of Children* § 42))). *See also Swanson*, 2 S.W.3d at 184.

In determining whether a parent's conduct "evinces a settled purpose to forego all parental duties and relinquish all parental claims" to a child, courts may look to the following factors:

> (1) the parent's ability to support the child; (2) the amount of support provided; (3) the extent and nature of the contact between the parent and the child; (4) the frequency of gifts; (5) whether the parent voluntarily relinquished custody of the child; (6) the length of time the child has been separated from the parent; and (7) the home environment and conduct of the parent prior to removal.

*Swanson*, 2 S.W.3d at 184 (citing *O'Daniel v. Messier*, 905 S.W.2d 182, 187 (Tenn. Ct. App. 1995)).

---

[6] Because the *Bowling* Court considered the broad issue of what constitutes "abandonment" for purposes of the adoption statutes, we conclude that the same standard should also be applied to the definition of "willfully failed to visit." We therefore further conclude that courts must refrain from reading an element of intent into the aforementioned definition.

The facts of this case indicate that Young failed to make any attempts to contact or visit with minor children from June 1999 through October 2000. Further, there is absolutely no evidence in the record to demonstrate that Young made any effort to contact or visit with her children from October 2000 to March 2001, the five month period preceding the filing of the termination petition. It is undisputed that Young has failed to provide financial support to minor children upon their removal from her custody in April 1999.

Young argues that DCS's failure to maintain contact, despite their alleged knowledge of appellant's presence in Holly Springs, Mississippi, was the primary reason for her inability to visit with minor children. Young insists that DCS, by disregarding this information, failed to make reasonable efforts to arrange visitation. For this reason, Young asserts that termination of her parental rights cannot be premised on allegations of abandonment, because it was DCS, and not appellant, who failed to maintain contact and arrange visitation.

In her testimony, Young revealed that she moved to her current residence in Holly Springs around January 2001, but fails to account for her whereabouts from June 1999 through January 2001. In contrast to Young's allegations, the sworn affidavits filed by case managers Wade and Windham support a finding that DCS made reasonable efforts to locate Young at her last known location, Memphis, Tennessee.[7] Further, we are unable to accept Young's position that DCS bears the sole burden for maintaining contact with the parent and organizing visitation schedules. As a parent, Young had a duty to make every reasonable effort to arrange and insist upon visitation with her children. Moreover, the visitation provisions of the Adoption Statutes do not state or even suggest that it is the exclusive responsibility of DCS to arrange for visitation between parent and child.

Young's contention at oral argument that her mental deficiencies prevented her from knowing how to contact DCS is belied by her testimony that she personally called DCS to arrange the two 1999 visits with her children. Recognizing that Young, without the assistance or advice of counsel, was cognizant enough to initiate arrangements for two separate visits in 1999, we are unable to accept any argument from appellant that she was not mentally or emotionally capable of arranging consistent visits with her children.

Young further notes that she did not have access to an automobile, and therefore was unable to drive from Mississippi to Pinson, Tennessee to visit her children at their foster home. While it is undisputed that Young did not own an automobile during the time period in question, appellant's testimony reveals that DCS arranged transportation for both of her 1999 visits. There is no evidence in the record to suggest that DCS indicated to Young that transportation would not be available for continued visitations.

---

[7] As part of her sworn testimony at the January 27 hearing, Young admitted that someone at DCS called to try and set up an appointment with her. Although Young admitted to receiving a call, she testified that DCS did not contact appellant at her home or her mother's home. Precisely when and where DCS contacted Young is unclear in the record.

As for her failure to provide financial support to minor children, Young asserts that she "did not have the ability to pay child support since she was unemployed and receiving financial assistance." However, we do not conclude that her failure to support constituted abandonment.

Based on the above facts, we find clear and convincing evidence to support a finding that Young's failure to visit the minor children for the four months immediately preceding the filing of the termination petition at issue in this case, constitutes abandonment under T.C.A. § 36-1-102. Therefore, the juvenile court properly terminated Young's parental rights on the grounds of abandonment.

T.C.A. § 36-1-113(g)(3)(A)(I) authorizes a court to terminate the parental rights of an individual where "[t]he conditions which led to the child's removal *or other conditions* which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist." (emphasis added). In interpreting this statute, Young argues that the conditions of homelessness, malnourishment, and lack of hygiene that existed to warrant removal of minor children as dependent and neglected, have been remedied. Appellant specifically points to the fact that she is currently living in a two bedroom, one bathroom home in Holly Springs, Mississippi, blocks from relatives.

While it may be true that Young has remedied certain conditions that led to the children's removal, our concern is with such "other conditions" that are present to necessitate a finding that a "reasonable probability" exists that the children would be subjected to further neglect if returned to the care of appellant Young. We first note that appellant currently resides in a two bedroom, one bathroom home with three of her eight children.[8] If the minor children were allowed to return to Young's care, an already crowded two bedroom home would become even more uncomfortable and restrictive. While the living arrangement is a marked improvement from life on the streets, we are unable to find that Young's current residence is sufficient to accommodate the addition of three new children.

Additionally, there is absolutely no evidence in the record, aside from vague assertions by appellant Young that she has relatives who are willing to lend support,[9] that Young is capable of financially supporting three more children. Young testified that she is currently unemployed, and there is no evidence to indicate that she has any known job prospects. When questioned about future employment, Young testified that Ms. Elizabeth Chris, an employee or representative of a Holly Springs job placement program, has offered to help appellant locate employment; however, despite this offer, Young has not contacted Ms. Chris. With regard to her current monthly income, Young testified that she receives approximately $500.00 a month from AFDC and food stamps. Based on Young's estimation of her monthly income, and recognizing appellant's limited employment

---

[8] According to Bernstein's Confidential Answer, two of Young's children are being raised by their maternal grandmother.

[9] In his Confidential Answer, Bernstein noted that "[a]side from her 70 year old mother, who is already raising two of her children, Mother has no family support available to help her with the children."

prospects, we note that Young's financial resources are barely sufficient to provide for appellant and her three children living at the Holly Springs home, and are therefore unable to conclude that Young is financially capable of caring for three additional minor children. Our conclusion is further buttressed by Young's admission that she was unable to provide financial support to minor children from April 1999 through March 2001.

Particularly persuasive to our finding that other conditions are present to necessitate a finding that a reasonable probability exists that minor children would be subjected to further neglect if returned to mother's care, is the evidence that the Mississippi Department of Human Services ("MDHS") contacted appellant's cousin, Mary Jones ("Jones"), regarding three of Young's other children, who lived with her in Mississippi sometime during the 1980's.[10] Jones testified that she expressed a willingness to care for these children to Young because appellant "always kind of had a little problem with [the children]." We are further persuaded that a reasonable probability of continued neglect exists because of a statement in DCS's petition to have minor children declared dependent and neglect, reiterated in the Findings and Recommendations of juvenile court Referee, the Honorable George E. Blancett, that an "older sibling was previously removed from the mother's care for neglect." Considering this statement, together with MDHS's obvious concern regarding the welfare of three of appellant's other children, we conclude that Young has a history of neglecting her children, and find no evidence in the record to indicate that the conditions or characteristics that have led to such neglect have been remedied.

Finally, we note specific concern with regard to Young's mental health. At oral argument, appellant counsel stipulated that Young has mental health issues. From our reading of Young's testimony at the January 27 hearing, it is apparent that Young often has difficulty following or understanding direct questions. In his Confidential Answer, Bernstein describes Young's fragile mental state:

> Although Mother graduated from high school, it was Guardian's impression that she is intellectually slow and has some difficulty in following conversations and directions, in caring for the children, and in coping with everyday problems.
>
> *****************************************************
>
> Guardian believes that Mother would be unable to cope with the addition of three more children in her home now or at any time in the foreseeable future, although she would never purposefully harm

---

[10] There was some initial confusion surrounding Jones's testimony before the juvenile court judge at the January 27, 2002 hearing. When questioned as to whether anyone had contacted her "regarding the kids," Jones testified that the MDHS had called because of problems Young experienced with her children in 1980 or 1989, while living in Mississippi. The judge correctly reasoned and clarified that Ms. Jones was referring to three of Young's older children, and not to the minor children involved in this case, as none of them have ever lived in Mississippi, and the oldest of whom was not born until 1992.

Children, that any continuing relationship between her and Children would confuse Children and detrimentally affect their adjustment to life in the home where they now live or will live in the future.

On the basis of the above cited facts, we find clear and convincing evidence that such other conditions exist so as to create a reasonable probability of continued neglect, thereby warranting termination of Young's parental rights to minor children.

To properly terminate Young's parental rights, the court must find that termination is in the best interests of minor children. Based on the factors of unemployment, inadequate financial and residential resources, history of past neglect, and stipulated mental concerns discussed above, we find that it is in the best interests of minor children to terminate Young's parental rights. We also recognize that, in light of the findings contained within Bernstein's Confidential Answer, minor children did not "remember Mother or their other siblings, [and] each specifically stated that they did not want to return to her home and had no interest in seeing Mother." Bernstein's report is consistent with Windham's testimony regarding the relationship between Young and minor children, in which Windham relayed that the DCS reports on appellant's 1999 visits with the children stated that "the mother had to be encouraged to hug her children. The children really weren't interacting with the mother. They were interacting with their older brother, Randy, more than the mother."

Our decision that termination of Young's parental rights is in the best interests of the minor children is further supported by Bernstein's conclusion that it was in the best interests of minor children to terminate said rights, regardless of whether the foster parents wished to adopt.

While Young clearly has a right to the care, custody, and control of minor children, such right is not absolute. The facts in this case indicate, by clear and convincing evidence, that it is in the best interests of minor children to terminate Young's parental rights. According to T.C.A. § 36-1-101(d) (2001):

> In all cases, when the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child, which interests are hereby recognized as constitutionally protected and, to that end, this part shall be liberally construed.

We therefore uphold the decision of the juvenile court terminating Young's parental rights. Because we find that Young's parental rights were properly subject to termination on the grounds of abandonment and the presence of "other conditions" that created a "reasonable probability" of continued neglect, and that termination was in the best interests of minor children, we pretermit all issues regarding the validity of, or Young's substantial compliance with, the permanency plan.

The order of the juvenile court terminating parental rights is affirmed, and the case is remanded to the juvenile court for such further proceedings as are necessary. Costs of the appeal are assessed to appellant, Gloria Jean Young, and her surety.

-15-

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.